Good morning and please be seated. The third member of our panel, Justice Zinoff, became ill within the last 24 hours and so she is not able to be here after preparing all five questions. She will be listening to the internet presentation. She has submitted some general questions that we're asking, so she is very much a part of the proceedings and we will not, of course, make a decision until she has had an opportunity to weigh in. Justice Zinoff, I may, for the record, this is the fourth case in the morning, call 211-0808 on behalf of the people of the state of Illinois v. Passion Thomas, on behalf of the appellant, Ms. Kathleen Hamel, on behalf of the people, Ms. Collin Price. Good morning, Your Honors. Kathleen Hamel for the defendant appellant, Passion Thomas. Ms. Thomas was convicted of three counts each of forgery, retail theft, and theft. All of the charges were based on claims that she used counterfeit $100 bills in three stores at the Huntley Outlet Mall on October 31, 2010. We are not challenging the three convictions, one of each offense, that she received based on her conduct at the BCBG store at that mall. She was more or less caught red-handed. Well, that was only, that was just one forgery, wasn't it? Yes, one forgery, one retail theft, and one theft. Well, she, no, she paid for the merchandise. Oh, you're right, my goodness. She paid for the merchandise with a $20 bill and she didn't get any change. No, you're absolutely right. So it's just the forgery. Yes. Okay. However, we do challenge the identification, the reliability of the identification testimony that was given by the Torres R. S. and Lynn Bryant clerks. There you go. Our second related claim is that the defense counsel was ineffective for not tendering IPI 3.15 on these circumstances should be considered when weighing or assessing the reliability of identification testimony. I'd like to start this morning by making a point that I think is actually relevant to both of our claims, and that is that the reliability of identification testimony is not the same as the credibility of the witness who is making the identification. A witness can be sincerely convinced that her identification is accurate, despite the fact that when it's assessed objectively, looking at the circumstances that surround it and are relevant to it, it is apparent that it's actually not very reliable. In Manson v. Braithwaite, the United States Supreme Court has recognized this by identifying circumstances that should be considered when assessing whether or not identification testimony is reliable. And those are the witness's opportunity to observe the offender, the degree of her attention that she pays while she's in the presence of the offender, the accuracy of any description that she gives prior to making her identification, the level of her certainty when she makes her identifications, and the length of time between the crime and the identification. Our position is that when you view the identification testimony given in this case in the light of those circumstances, it's not sufficiently reliable to support the convictions that we are challenging. Now, Ms. Ramos was very particular about her identification, and she in fact identified her in the courtroom, as did Mr. Bailey. Isn't that correct? It is Ms. Crumweedy who could not identify her in court. Mr. Bailey was the security guard, and he only encountered the defendant at the BCBG store. So his identification is only relevant to that. Ms. Ramos did identify her in court. However, if you look at that identification against all the other factors, it's not a credible identification. I should point out right here that the fourth factor in Manson v. Braithwaite is the level of certainty of the identifier. That does not necessarily mean that extreme certainty means extreme reliability. If a witness is very certain, but the circumstances surrounding the identification are not such in which it could possibly afford a certain identification, then actually that undermines the reliability of the identification. Here, the identifications were made during a brief encounter during a cash register where Ramos was the cashier and the defendant was the customer. The offender was the customer. Didn't both of them, though, say, I mean, there's some testimony that the day had gone in spurts. It was maybe a little busier at some times and not so much at another. And I think it was either Ms. Ramos or Ms. Primwiti who actually said that they were able to watch the person from the time they came into the store because the store wasn't that busy. And I can't remember which one it was. Well, being able to watch somebody in the store is one thing. Being able to, you know, taking notes, noting the appearance of the person so that you can remember it afterwards when you have absolutely no reason to do so is another. This is a situation where, I mean, again, looking at the factors, the opportunity to observe and the degree of attention, this is a situation where it was only afterward that they realized, several hours afterward in the case of Primwiti and at least an hour or so afterwards in the case of Ramos, a couple of hours, that there was any reason to pay any attention to this person's appearance. It's true that, you know, there was a $100 bill tendered, but both clerks said that that was not a remarkable circumstance. Well, they all, well, the one, let's see, the only one who really questioned the $100 bill was Kirkstra and BCBG. Yes. The other two, one wasn't even suspicious and the other one might have been suspicious, was maybe the testimony. Yes, but they, but neither of them, you know, they simply, you know, completed the transaction, the person left the door. And it's just simple human experience that it is tough to remember what somebody looks like. And we also, ID is critical here, but there are some other issues that relate to this ID that, and they're not identification testimony, but they're the defendant's own statements that tend to be significant, are considered inconsistent. Her, yes, she told two entirely different stories as to how she obtained the $100 bill that she used in BCBG. She's also telling, I think, another interesting different story. At one point she says she's with her sister and a friend and at yet another point she says she's with a cousin. Yeah. And she tries to call her sister, but the sister doesn't answer, but there's never any other reference to the cousin, other than I think on the stand she says she's with her cousin. So that's different as well. Well, her testimony is dubious regarding, but again, all these things go more to the BCBG. What we really need is not just for the defendant to be a dubious person, but we need to have some affirmative evidence that she was the offender at the Toys R Us and the Lane Bryant story. Well, if the jury doesn't believe her, but the jury believes the witnesses, and it's a question of credibility, how can we, this court, step in and say that decision was wrong? I think because it really, in this case, it really wasn't a question of credibility so much as it was of reliability, and they are different. The reliability of the identification testimony was insufficient. But you keep saying, you keep going back to that. What was so inherently unreliable about the ability to observe, the length of time, I mean, the factors that you just recited? Virtually everything. Again, the opportunity and the encounters themselves were routine business encounters from the court's point of view. It's a slow day. It's Halloween. It's a slow day. You're looking right at somebody when you're engaged in a transaction, taking money, giving change, handing over the merchandise. I mean, what's so inherently unreliable about that encounter for three different events? Neither of them said that it was an extraordinary incident while they were seeing him. It is human experience that when you encounter a stranger for a few moments in an unremarkable circumstances, you are not going to be able to remember well enough what that person looks like to make a credible identification nine days and ten days after you saw them. So your position would be, and if we accept your position, that as long as it is an unremarkable encounter, all identifications are inherently unreliable. Well, no, that's one strong factor for thinking so. Another one is the accuracy of the clerk's original descriptions as compared to what the defendant actually looked like on that day. We actually know what she looked like on that day because state's witnesses, the BCBG clerk, the security guard, and also this police officer that encountered her shortly after she left the BCG store said she was an African American. She was wearing a black coat that had fur trim apparently on the hood or the collar, and she wore high heels. The defender herself testified that she was 5'2". She was in court when she testified it, and the prosecution didn't challenge her. If she really was 5'7 or something, they could have easily found somebody in the courtroom who had a known height and exposed her. And on top of that, none of the people who actually saw her described a distinctive hairdo, namely a tight, high ponytail. The Toys R Us clerk, in her original description, has the offender much taller than the defendant. Rather than 5'2", she said she herself was 5'7 and that the offender was taller than that. The Lane Bryant clerk was absolutely positive in court that I am sure about one thing. I'm sure that she wore a white jacket and a high ponytail. She said that when she was confronted with the fact that her original description included a red and white striped garment. I believe the Toys R Us clerk originally included a red and gray striped garment or something like that. But neither of those clerks mentioned this black coat with fur trim. So the prior descriptions are inaccurate as far as they go. Again, I've already addressed the length of time between the encounters. It's nine days in one case and ten days in another. I mean, between the crime and the photo line-up. Nine days in one case, ten days in the other. The comments that they made about their photo line-ups was that this is the person who looked most like the offender. And although I'm not challenging the legality of the photo line-up, it is worth noticing that of the six women depicted there, the defendant's picture was the only one that was a driver's license picture. And she looks kind of happy and animated, more like a shopper. Whereas the other five look like they're about to be locked up in jail. And she stands out in that way. So, which could explain a bad ID. What about another factor that the jury considered? And that is, again, when she is confronted. And we have to talk about BCBG because that's where the $100 bill in that forgery comes to light. She tenders that. Now the clerk, for whatever reason, doesn't like it. She uses that little pen and says, I'm sorry, I can't take this. I don't think it's real. Do you have some other way to pay? She pulls out money and then says, well, you know, if it's fake, just keep it. Now, by any stretch of the imagination, she is a student who either made this money fixing hair or just exchanged it with a woman she had no idea who she was so she could eat. And she gave her valid U.S. currency and took the $100 bill. I mean, I'm going to be angry. I'm not going to be going, oh, gee, just keep it. Now the jury has to look at that, and everybody's testified she was calm. I'm assuming she was calm as she testified. There's no reference or there's nothing in the record that says, ma'am, you have to answer the question. Ma'am, don't get so emotional. So she seems to be fairly calm as she is testifying. The jury should consider this as well, shouldn't they? Well, certainly it was a terrible fact regarding the BCBG conviction. It's primarily the reason why we aren't challenging it on this appeal. I don't think there is any inference that can be drawn from that other than guilt of that particular one. However, we do have a situation here where it was established at the trial that there was at least one other woman in that mall at that time passing counterfeit $100 bills. And strangely enough, that other woman matched the same description of the woman that she got the $100 bill from at great stake. I mean, I like coincidence, but that's a pretty big one. That is. Well, of course, she would know that from discovery. Well, then, now, so she's going to make it fit? I mean, that's not necessarily in her favor. No, no, it isn't. Okay, I totally agree that there is a funny smell to that whole thing. There is a possibility that maybe these women were in some way connected with each other. However, the state didn't charge my client on a theory of accountability, and the jury didn't make any finding on accountability. The state assumed the burden of proving that my client personally committed the crimes at Toys R Us and at Lane Bryant. And asking a reliable identification or some other proof of that. I've sort of led you to this discussion here, but it's not in your brief. Why didn't you discuss that in your brief on the issue of accountability? I mean, it's not clearly in your brief. Oh, I think it's perhaps in the reply someplace. I must have said that they didn't charge her with accountability. Well, it must have been in reply. Okay. I apologize if I didn't, but that is absolutely the case. She was not charged with accountability. Anyway, getting back to the proof of the other person, which was a security guard's testimony, admittedly on cross-examination, that he received a call from a couple of stores saying that they had received bad $100 bills. One was a designer fragrance store. And that clerk provided a description of a woman who was tall and was wearing a red and white striped garment and had a tight ponytail. And he actually, as he was walking in this direction, he encountered, saw somebody who fit that description and followed that woman out of the mall. I believe Huntley outlet, it's not in the record, but as a practical matter, it's an outdoor mall. But followed her to her car, or to a car that picked her up, and she departed from the mall property. He then began surveying stores, and the second store that he went to was DCBG, and he happened to arrive just as the defendant was at the counter. That's another interesting point. As Mr. Bailey, or Mr. Brendan, as defense attorney often calls him, testified that this other woman that he followed, who matched a description he had gotten from designer fragrances, approached his car, it started to move, and essentially she got into a moving car. I mean, the jury's listening to this too. This is a rather unusual circumstance. We tell our children, don't do that, you could get hurt. Why would you get into a moving car? And that's a question that they may have asked. I would say the woman in red and white probably did so in order to get away from the mall quickly. She must have known that she had been detected. But even that heightens the likelihood that this is another woman who was passing $100 bills. So there may have been several women, for all we know. The way Brian Clark's description of a woman who isn't as tall as that woman, but is wearing a white jacket and a ponytail, that could have been a third person. It could have been the same person whose height was misunderstood. Because she also did say a red and white striped garment, as Ramos said, in her initial thing. So we have kind of chaotic information regarding all those things. But what we don't have is a reliable identification by either of those clerks that my client was the offender. Let's talk briefly about the instruction, because technically your time is up. Yes. Simply our second argument is that the jury was not able to consider demands to be raised by factors, which are the very things I've just gone through that show that it was an unreliable identification, because defense counsel did not request that IPI 3.15 be given. So the only disputed issue in this case on these charges was identification. The instruction would have given the jurors many reasons to question the reliability of the identification testimony. There was no imaginable reason why it wasn't given. And it was a critical issue in the case. It was unprofessional not to give the instruction. And the likelihood of the outcome would have been different, because the verdicts in this case are only as reliable as an identification testimony was. But the jury was given the basic instruction about you are the judges of the credibility. You have to observe the witnesses and their opportunity to observe, which is a Manson concept. Age, not necessarily. Memory would be. Manner while testifying might be. Interest, bias, and prejudice he or she may have. And the reasonableness of the testimony considered in light of all the evidence, which is kind of a, it might not be a good summary of the Manson factors, but the reasonableness of that testimony in view of all of the evidence. Why isn't that alone sufficient? I think because credibility and reliability are not the same thing. By having that instruction and not the instruction on how to assess credibility, apart from reliability, apart from credibility, the jurors were likely to have confused the two and to have found that if the clerks appeared credible, their identification testimony must also be taken as reliable. And that is why it's a real problem in a case like this. And probably, I believe, would have changed the jury's deliberations entirely had they had the Manson, the Braithwaite factors in front of them when they deliberated in this case. And so, for those reasons, we ask alternative. We first ask for reversal of the convictions for the Troyes and Russell and Bryant offenses and alternatively for an attorney. Thank you. Ms. Price. Your honors, counsel, may it please the court, I am Colleen Price and I represent the people of the state of Illinois. The first thing that people would like to address is this idea that credibility and reliability are separate. This was not addressed in the brief. However, I will do my best to, at this time, to try to address it in the brief. And really, the reason why this has come up is because it's about an article of clothing and the defendant has taken this opportunity to try to make a difference and say that, you know, credibility, you can be really into your conviction about how you thought they looked, but that somehow makes it unreliable. Now, what we have here, it really comes down to clothing and it does come down to credibility and it comes down to what the jury believed the actual description was. Now, we have this initial description, which, by the way, was completely brought out through a cross and in an attempt to impeach the witness, which has to do with credibility. And when they were asked on the day of when they did the photo lineups, for example, Felicia Ramos from Lane Bryant, she had very much conviction about this woman wearing either a white or vest or jacket, heels. She talked about the heels, the sunglasses, everything like that. So when she was on the stand, they asked her again, on the 31st, she said this, and she said yes. And then on the day of the trial, on direct, she said that. So what we have is really about clothing, but so the best way to look at this for the sufficiency of the evidence, we don't overturn it unless it is so improbable and unsatisfactory and unconvincing, and that's not the case here. Let's look at the BCBG store. This sets it up. This is why she became a suspect, because she has a bill with the same serial number that can be tracked to every single one of these stores. She has her suspicious behavior where she's just like, keep it. I don't want it if it's fake. She's distancing herself. We have her changing stories for how she got the bill. Why was that necessary? You know, she just came out as completely incredible. So what we have, this is the reason why she became a suspect. So we can track this back. We go to the Lane Bryant. Let's look at this store separately. We have Felicia Ramos. She identifies her in the photo lineup, and then she IDs her in court. She remembers what the perpetrator bought. It was the only bill. She focused on her face, and she made a positive identification. And then we go to the Toys R Us Express, which seems to be the weakest of the stores. And she couldn't ID her in court. She said, could you identify her today in court? I don't know. I'm sorry. No. This is a considerate and honest response. And you can take that same credibility and reliability, if there is a difference, and apply it to the photo lineup, which is why the jury was really taken with this. They witnessed her. They found these clothes that she was wearing to be the clothes. And in any case, the people have cited some cases in here about discrepancies in clothing. And, again, it goes to the weight of the evidence and the credibility of the witnesses. So the defendant just simply was not credible. And so the totality of the circumstances, all witnesses, actually, all witnesses described clothing other than the red striped garment. So you could even say there were four women walking around. The thing is, what the most compelling piece of evidence is they identified her by her face. And that was the most compelling and reliable evidence. So, and according to SLIM, which when I get to the factors for identification, which is based on SLIM-adopted Manson v. Braithwaite, an identification is sufficient to support a conviction if the witness viewed a defendant under circumstances permitting a positive identification. We were in stores. There was lighting. Felicia Ramos greeted her. And there were $100 bills, although they said that that was not unremarkable. They still had to take the time, and they still identified her by her face. They were looking here, not here. Do you have any questions? Not about that right now. Okay. All right. Would you like me to go into the record? You mentioned about serial numbers. I don't recall that. Oh, the record. Sorry. May I take a moment? Sure. Go ahead. Okay. We have record. What page in the brief? Oh, what page in the brief? In the brief, page nine. I filed a motion to supplement the record. And as a part of the evidence, the exhibits, I included people's exhibits number one, two, and three, which are photocopies of the counterfeit bills. Special Agent Dahl on page 255 to 56 talked about how they were virtually identical to each other. I think, actually, in defendant's brief, she mentioned that the police officer testified that from his, he witnessed that they were the same. But that's why the people filed a motion to supplement, because we wanted the court to be able to see that these numbers were the same. So that's page nine of the appellee's brief. They were printed on the wrong kind of paper. They were two pieces of paper printed on a common inkjet printer. And Agent Dahl testified that they were right on average of counterfeit money, and they had the ability to deceive a person, which defendants not challenging on appeal. Anything else? No. So we have a course of behavior here where defendant was caught red-handed with this counterfeit bill. It has the same serial number as the other two stores. This is what brought her into the spotlight. So they took her as a suspect. They presented her in a photo lineup to Ms. Crumweed and Ms. Ramos, and they both identified her from this photo lineup. This is where this, what defendant calls the difference between reliability and credibility, is that regardless of the clothing, they consistently identified her by her face. And so how does that relate to the instruction that defense counsel or appellate counsel said should have been tendered? Strickland and People v. Manning say that there's a strong presumption that a trial strategy and that counsel performed competently. And the court gives deference to these trial tactics even where it would have acted differently. Here, the choice of the jury instruction is a tactical decision within the trial counsel's discretion. Ineffective assistance can only be found in cases of jury instructions where it's critical to defense and where the omission denies the accused of a fair trial. Now, in the appellee's brief, we distinguished Lowry, which had to do with a jury instruction with the element knowingly. And the court found that that was ineffective assistance. But that was only ineffective assistance, not a right-line rule. It became a problem when the jury expressed confusion. And that was not remedied. That defendant was denied a fair trial. And then we have Butler, which was an accomplice testimony and also grievous errors made by trial counsel, which had a cumulative effect and highly questionable circumstantial evidence. And here we don't have highly questionable circumstantial evidence. All we have is a discrepancy of clothing, which can be written off as they were focusing on her face. They identified her face. There was a moat, the same bill used at each store. This is nowhere near the highly questionable evidence that existed in Butler. So here we have IPI 3.15. It is based off of Neal v. Biggers from 1972, a United States Supreme Court case, and then adopted again in Manson v. Braithwaite. Do you want any of the sites for these? Okay. Which was 1977. And then People v. Slim. The Illinois Supreme Court has adopted this as law. And actually, Slim talks about it and says whether there is a substantial likelihood of misidentification, these factors should be scrutinized. But it also went on to go under the totality of the circumstances. So it's a totality where the identification was reliable. So we look to Supreme Court Rule 451A, and it says, Well, this wasn't even offered. No, it was not offered. It's slightly different. Yeah. But the Supreme Court rule is instructive in that it says, Now, one of the cases I did cite, People v. Lewis, that's 165 Illinois 2nd, 305 from 1995. I cited this for the fourth, the fifth factor, the length of time. But in preparing for this, if you want, I can do a supplemental brief. But this had to do with a case where it was the third edition, but it was substantially the same instruction, or identical. And what happened was the defense counsel proposed the instruction. The state objected. The court said no. And when our Supreme Court looked at this, they said the evidence did not support the tender of the instruction. And so this is why, with the Supreme Court rule, with People v. Lewis, why this analysis should be adopted in whether or not counsel, it can be a tactical decision to choose whether or not to present IPI 3.15. So why would there be any reason for counsel not to? What is this going to draw the jury's attention to that would be harmful to her client? Nothing. In this case, the people submit that this instruction, this is the perfect case where the instruction would have been detrimental to defendant's case. And how? Well, let's break it down. The opportunity of the witness had to view the offender at the time of the offense. Defendant does not dispute this factor in her brief because it was slim. Is there an opportunity to make a positive identification? They were in store. It was lit. They talked about spurts and whatnot. And one of the clerks, I greeted her and everything like that. So there was an opportunity to view defendant. Two, the witness's degree of attention at the time of the offense. Defendant does dispute this. At first, it seems like it goes against the people. But on the other hand, the witnesses remembered certain key details, that she was wearing heels, and they remembered her face and what she bought. Now, defendant disputes that it was unremarkable. They said that, you know, they had gotten $100 bills. It was the only one. But, you know, it didn't, it wasn't very remarkable to them. However, you know, they remembered what she had bought and they remembered her face. And then they stuck by their descriptions that they made on October, November 9th, whenever their lineups were done. And so it's debatable. The people are in a position that this actually supports the people rather than defendant. It actually goes against defendant. Three, the witness's earlier description. This does seem to go against the people. However, the witnesses stuck by their descriptions given on the date of the photo lineup. And they were consistent in identifying defendant from the photo lineup. Felicia Ramos was able to also identify the defendant in court. Did Ms. Crumweedy reference this particular factor? Did she change her description of the clothing? Because at trial she said the woman was wearing a black and gray sweatshirt with a hood. But did she tell the police officer she was wearing something else at the time of their first inquiry? That came out on cross. That was just about the police report, what she allegedly said to the police. However, if I have it in here. Well, I think she said she was wearing a red and gray striped sweatshirt with a hood. Yeah, it's kind of odd actually. I cited it in the appellee's brief that in context. And if I'll take you to page 139 and 140 of the record. Yes, question. Now the $100. Oh, sorry. Oh, I don't have that one actually. You can see though that she does. She has two, they're not significantly different, but we mentioned the red again. Red, this red is certainly different than a black or a gray. Yes. Let me see right here. That's all right, you have two to go. Level of certainty and length of time. Oh, okay. And the length of, oh, did I do certainty? Oh, yes, the certainty, high in the people's favor. Once the instructions, the acknowledgement sheet was read, they identified the defendant within two minutes and acknowledged and stuck by their choices at trial. And then the length of the time, the people also addressed this in the brief, nine and ten days. This is undeniably in the state's favor. This is not a significant period of time and much longer lengths have been approved by the court. And this was on our page 35 and 36 of the appellee's brief. And they, the officer, detective, the detective who administered, he said that there were no distractions or anything like that that got in the way of their identification. So are there any more questions about this? So your bottom line is that the defense attorney and the trial court would look at this evidence the way you do and conclude that it was not going to help the defendant here to have this instruction before the jury. Well, there's that presumption that it's going to be, that the defendant's counsel acted competently. And so we have to presume that she analyzed this and that she decided not to do it. And I think this is evident, too, in her focus on the prior description that she elicited from the cross. She talked about this other person. She made it known to the jury that there was this other woman walking around and they rejected it. They found that to not be the person. They were very taken by the fact that defendant was identified by her face. And this behavior, as much as the defendant tries to sever it at the BCBG from the other stores, you have to look at the totality of the circumstances. All this evidence was presented. They rejected that first one and said that, no, this is what she was wearing. But the fact of the matter is the clothing changed, but the face didn't. And so in the light most favorable to the prosecution, any rational try or effect would have found the essential elements of these crimes and have found her identity. And with the jury instruction, so the people say that this was tactics. And should this court find that it wasn't, it was not prejudicial because the defendant's attorney amply presented this fact of an alternative perpetrator and they expressly rejected it when they found her guilty of these crimes. So any more questions? No, thank you. And so may I do a short close? Yes. Thank you. So the jury must draw reasonable inferences from the basic facts of the facts. This is Cunningham. It was reasonable for the jury not to put much weight on the attire. Any discrepancies do not raise defendant's claim to that of reasonable doubt. The jury's verdict sent a clear message that they disregarded an alternative perpetrator. Defendant's excuses didn't add up and the totality of the circumstances. The same bill for all the stores, her face being identified. She was identified. This mystery woman who exists but has been tried in defendant's eyes as being the one passing just because she happened to be wearing a similar red striped garment is not enough. And as for the jury instructions, this was not an unprofessional error. It was a tactical decision and the facts and circumstances, the evidence did not support the issuance of this instruction. Should this court find otherwise, the instruction would not have resulted in an acquittal. The people will not speculate as to this other woman or her relationship, if any, with the defendant. Those stores were not on trial that day. This was about these three stores, these two stores that she's trying to appeal. And so defendant passed these counterfeit bills. Thank you. And the people respectfully request that this Honorable Court affirm her convictions. Thank you. Ms. Hamel. I'd like to address the jury instruction thing first. Simply, the state still has no suggestion of any strategic reason why a defense counsel would not request this instruction. The parties, the court, nobody even mentioned it. It looks far more likely that it was overlooked rather than that it was deliberately chosen not to give it. Also, regarding whether the instruction on credibility is sufficient to make up for the loss of it, the committee note that accompanies the instruction 3.15, it has some rather strong language. The committee says that the committee unanimously believes that eyewitness identification is a subject deserving of judicial comment and believes that the instruction would serve the interests of justice by offering guidance in an area that contains complexities and pitfalls not readily apparent to some jurors. And I think that goes precisely to the main point that the state makes, which is that my client was identified by her face. Again, these are the kind that she was not identified as having, you know, a distinctive scar on one side or funny eyes or anything like that. She was simply that's who I remember supposedly or at least on the part of the one, the one clerk who was able to make an in-court ID. This is precisely the sort of situation where credibility could be mistaken for reliability of an identification. So for all those reasons and those that we give in our briefs, we ask that these convictions be reversed or alternatively that my client receive a new trial with proper jury instructions. Thank you. Thank you. All right. Thank you, counsel, for your argument. This matter will be taken under advisement. We will issue a decision in due course primarily after Justice Zinoff has had a chance to hear the argument and review any other comments from this panel. So we will stand in recess until our next case. But in the meantime, everybody can just have a seat, and I'm going to take a bit of privilege here. Ms. Price, are you relatively new with the office? Yes. Well, I figured as much since you had quite an audience. And welcome. Thank you. Furthermore, and since I believe that you were, I decided not to be Justice McLaren. But I'm sure that your colleagues have told you that we have our own eccentricities, and I didn't want you to have your jaw drop if I said in place of Justice McLaren, well, what if this was a twin? Because I couldn't even see that happening in my job. So welcome, and thank you for argument, and we look forward to seeing you all again.